John F. REGAN, International Brotherhood of Corrections Officers, on behalf of themselves and all others similarly situated, Plaintiffs, and

The Commonwealth of Massachusetts, Plaintiff–Intervenor,

v.

THE UNITED STATES of America, Defendant

No. CIV.A.02–10696 WGY.

United States District Court, D. Massachusetts.

March 14, 2006.

---

Alejandro L. Bertoldo, Department of Justice, Washington, DC, for United States of America, Defendant.

Lawrence D. Humphrey, National Association of Government Employees, Quincy, MA, for John F. Regan, Plaintiff.

Barry E. Reiferson, U.S. Department of Justice, Washington, DC, for United States of America, Defendant.

Peter Sacks, Attorney General's Office, Boston, MA, for Commonwealth of Massachusetts, Intervenor Plaintiff.

Barbara Healy Smith, United States Attorney's Office, Boston, MA, for United States of America, Defendant.

## MEMORANDUM

YOUNG, District Judge.

## I. INTRODUCTION

■ The Commonwealth of Massachusetts ("the Commonwealth") has largely abolished county government and transferred county employees to state employ. The United States and the Commonwealth have different perspectives on the impact that this consolidation has on the availability of the continuing-employment exception to the Medicare tax. The issue, as framed below, is one of first impression:

Does the Commonwealth's abolition of county governments and subsequent transfer of county employees to state employment render the employees newly hired and the state a new employer for the purposes of the continuing-employment exception?

This Court rules that the Commonwealth's actions do not render the employees newly hired and the state a new employer for the purposes of the continuing-employment exception. The statute involved is unclear and ambiguous on resolving the issue. A close examination of the legislative history supports that a consolidation should not interrupt the continuity of employment. Thus, the more reasonable conclusion is that this consolidation does not interrupt the continuity of employment for the continuing-employment exception.

John Regan, the International Brotherhood of Correctional Officers, others similarly situated, and the Commonwealth (collectively, "the Plaintiffs")[1] claim that they qualify for a continuing-employment exception to the Medicare tax. Am. Compl. [Doc. No. 18] ¶¶ 8–14; Intervenor Compl. [Doc. No. 25] ¶ 2. The Plaintiffs allege that the Internal Revenue Service ("IRS") refused or failed to refund improperly assessed and collected taxes. Am. Compl. ¶¶ 8–14; Intervener Compl. ¶ 2. The United States claims that, as matter of law, these individuals and entities do not qualify for the continuing-employment exception. See Objection to Commonwealth of Massachusetts's Mot. for Partial Summ. J., and Cross–Mot. for Partial Summ. J. [Doc. No. 58] ("Cross–Mot. Summ. J."). The parties have agreed first to determine the

1. Forty-seven individually named Plaintiffs bring this action as a test-case "agree[ing] to be bound by this Court's decision on th[e] legal issue, as presented by John F. Regan." Joint Stipulation Allowing Joinder Of Additional Plaintiffs In Lieu Of A Class Action [Doc. No. 16] ¶ 2.

The Commonwealth brings this action both on its own behalf and representing approximately 500 employees. Intervenor Compl. ¶ 2; See Intervener Compl., Ex. A.

issue of whether the continuing-employment exception should continue to apply to the previously excepted employees and the Commonwealth. *See* Cross–Mot. Summ. J. at 1 n. 1. Thus, factual issues pertaining to specific tax refund claims are not under consideration on these cross-motions for summary judgment. *See id.*

### A. Background

The following recitation of facts is compiled from Plaintiff Regan's Memorandum in Support of Summary Judgment [Doc. No. 39], the Commonwealth's Statement of Undisputed Material Facts [Doc. No. 45], the Commonwealth's Memorandum in Support of Partial Summary Judgment [Doc. No. 46], and the Defendant's Objection to Commonwealth of Massachusetts's Motion for Partial Summary Judgment and Cross–Motion for Partial Summary Judgment [Doc. No. 58].

For the purpose of deciding the Plaintiffs' Motions for Partial Summary Judgment, were a factual dispute to exist, the Court must take the United States's version of the facts as true, where supported by record evidence, and draw all reasonable inference in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Actually, however, there are no material issues of fact in dispute.[2]

### 1. The abolition of seven counties

The Commonwealth of Massachusetts passed various statutes ("the Acts") between 1996 and 2000 which abolished the great bulk of county government in seven counties. Commonwealth's Statement of

---

2. The Commonwealth and the United States agree that there are no material facts in dispute. Reply Mem. In Supp. of Comm.'s Mot. for Partial Summ. J. and Opp'n to United States Cross–Mot. [Doc. No. 61] at 2 n. 1 ("Comm.'s Reply Mem."). The United States, however, provided two separate statements of material facts in dispute should the Court deem the referenced issues either material or genuine issues of fact.

The first statement raises two potential issues. Def.'s Stat. Mat. Facts Dispute No. 1 [Doc. No. 58, Attach. 1]. The first issue, i.e. who employs Regan, is matter of law. *See* Def.'s Stat. Mat. Facts Dispute No. 1 ¶ 1; Mass. Gen. Laws ch. 34B, §§ 12–14; 1996 Mass. Legis. Serv. § 567(j), (n). The second, dealing with the label assigned to the abolition of the counties and transfer of employees, is immaterial. *See* Def.'s Stat. Mat. Facts Dispute No. 1 ¶ 2. As the Commonwealth correctly points out "[t]he particular label attached to the transaction—merger, consolidation, abolition/transfer, absorption—is of no consequence." Comm.'s Reply Mem. at 6 n. 4.

The second statement presents six potential issues in dispute. Def.'s Stat. Mat. Facts Dispute No. 2 [Doc. No. 59., Attach. 3]. The first, referring to the employer status of the sheriffs, is matter of law. *See* Def.'s Stat. Mat.

Facts Dispute No. 2 ¶ 1; §§ 12–14; § 567(j),(n). The second, dealing with the beneficiary of the sheriff's office functions, is immaterial. *See id.* ¶ 1. The third, whether the sheriffs' offices are independent state agencies, is matter of law. *See id.* ¶ 3. The fourth, pertaining to the employment status of the transferred county employees, is matter of law. *See* Def.'s Stat. Mat. Facts Dispute No. 2. ¶ 4; §§ 12–14; § 567(j), (n). The fifth, dealing with the employer status of the sheriffs, is matter of law. *See* Def.'s Stat. Mat. Facts Dispute No. 2 ¶ 5; §§ 12–14; § 567(j), (n). To the extent that there are any factual issues relating to the reporting, supervision, direction, or control of the sheriffs, these issues are immaterial. *See* Def.'s Stat. Mat. Facts Dispute No. 2. ¶ 5.

The sixth issue is a request to strike paragraph 12 of the Commonwealth's Statement of Undisputed Material Facts for lack of personal knowledge as provided for under Federal Rule of Civil Procedure 56(e). Even if the Court strikes paragraph 12, much of the same information is repeated by other individuals that the United States does not claim lack personal knowledge, is contained in legislative history whose facts are uncontested, or was admitted by the United States. *See* Comm.'s Stat. Undisp. Mat. Facts ¶¶ 14–19.

Undisputed Material Facts [Doc. No. 45] ¶ 3 ("Comm.'s Stat. Undisp. Mat. Facts"). These seven counties are Berkshire, Essex, Franklin, Hampden, Hampshire, Middlesex, and Worcester ("abolished counties"). *Id.* ¶ 3.

For some time previous to passage of these Acts, the Commonwealth had given the seven counties substantial funding to support their corrections systems. *Id.* ¶¶ 7–9. Each abolished county's "largest single category of [e]xpenditure" was its correction system. *Id.* ¶ 9. The Commonwealth passed the Acts in an attempt to ameliorate the abolished counties' respective financial difficulties and emergencies. *Id.* ¶ 14 (citing Answer to Intervener Compl. [Doc. No. 29] ¶ 6).

With the exception of the Act abolishing Franklin County, the Acts abolishing the counties were codified as Chapter 34B of the General Laws of Massachusetts. *Id.* ¶ 4. Set forth below is a list of the dates when each county was abolished ("abolished date" or "transfer date"):

| County: | Abolished: |
| --- | --- |
| Franklin | July 1, 1997 |
| Middlesex | July 11, 1997 |
| Hampden | July 1, 1998 |
| Worcester | July 1, 1998 |
| Hampshire | September 1, 1998 [3] |
| Essex | July 1, 1999 |
| Berkshire | July 1, 2000 |

Mass. Gen. Laws. ch. 34B, § 1; 1996 Mass. Legis. Serv. § 567(a) (indicating July 1, 1997 as the date when Franklin county was abolished).

By operation of law, the sheriffs and the sheriffs' employees of the abolished counties became employees of the Commonwealth.[4] Comm.'s Summ. J. Mem. at 6; Mass. Gen. Laws ch. 34B, §§ 12–13; 1996 Mass. Legis. Serv. § 567(j), (n). The sheriffs remain elected officials in each of the abolished counties. Mass. Gen. Laws ch. 34B, § 12; 1996 Mass. Legis. Serv. § 567(j). "After abolishment, the [e]mployees, under the aegis of the Commonwealth rather than the counties, performed the same or similar functions." Cross–Mot. Summ. J. at 2. The sheriffs and the sheriffs' employees were "transferred to

---

**3.** According to the most current law, September 1, 1998 is the date of transfer for "all functions, duties and responsibilities for the operation and management of the jail, house of correction[,] . . . and all duties and responsibilities for operation and management of property occupied primarily by the sheriff . . . ." Mass. Gen. Laws. ch. 34B, § 1. The *rest of Hampshire county was abolished* January 1, 1999. *Id.*

The Commonwealth and the United States assert that Hampshire County was abolished on July 1, 1998. United States Of America's Statement Of Undisputed Material Facts [Doc. No. 59, Attach. 4] ¶ 6 ("United States's Stat. Undisp. Mat. Facts"); Comm's Stat. Undisp. Mat. Facts ¶ 4. The Commonwealth and the United States find support for their assertion in an Act from 1998 which cites July 1, 1998 as the date of abolition. 1998 Mass. Acts 1305.

While July 1, 1998 was initially cited as the date of abolition, an Act passed in 1999, which codified the Acts abolishing the coun-

ties, cited September 1, 1998 as the date of abolition. 1999 Mass. Legis. Serv. ch. 127, § 53. The Massachusetts legislature provides no reason for the change in dates. As the most recent law indicates the date of abolition is September 1, 1998, the Court uses this date.

**4.** In the instant case, the employment *status* of the sheriffs and the sheriffs' employees is matter of law, as the status was statutorily established. *See* Mass. Gen. Laws ch. 34B, §§ 12–14; 1996 Mass. Legis. Serv. § 567(j), (n). Currently and at all times proceeding the dates of abolition, the sheriffs and the sheriffs' employees are employees of the Commonwealth. *Id.* Accordingly, the Plaintiffs' various theories for why the sheriffs, or the sheriffs' employees may not be Commonwealth employees are unavailing. *See* Regan's Summ. J. Mot. at 15, 18; Comm.'s Summ. J. Mot. at 15.

the [C]ommonwealth with no impairment of employment rights ... without interruption of service, without impairment of seniority, retirement or other rights of employees, without reduction in compensation or salary grade and without change in union representation." [5] Mass. Gen. Laws ch. 34B, § 14; *see also* 1996 Mass. Legis. Serv. § 567(j), (n). Additionally, the Commonwealth paid all the liabilities and assumed the leases and contracts of the abolished counties. Mass. Gen. Laws ch. 34B, §§ 5–7; 1996 Mass. Legis. Serv. § 567(c), (d); Comm.'s Stat. Undisp. Mat. Facts ¶ 13.

## 2. Introduction to the continuing-employment exception and private letter rulings

As will be discussed in greater detail, state and local employees were not subject to the Medicare tax before 1986. Comm.'s Summ. J. Mem. at 10. Many of these employees ended up qualifying for Medicare coverage through a spouse or another job. *See* H.R. Rep. 99–241, pt. 1, at 25 (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 603 ("House Report"). These employees drained the Medicare system by using Medicare services while making little or no contributions. *Id.* To address this issue, Congress extended the Medicare tax to all state and local employees. *Id.* at 25–26. Congress created a continuing-employment exception to the tax in order to prevent the huge, sudden financial burden which extension of the tax would otherwise impose on the states (which would then be obligated to pay into the Medicare fund). *Id.* The continuing-employment exception provided that the mandatory tax would apply only to newly hired employees.

Prior to the transfer date, various employees of the sheriffs' departments fell within the continuing-employment exception to the Medicare tax. Comm.'s Stat. Undisp. Mat. Facts ¶ 23. Shortly after the transfer date, the Massachusetts Comptroller began withholding wages from the previously excepted employees for the purpose of paying the Medicare tax. *Id.* ¶ 24.

On November 26, 1997, the Massachusetts Comptroller contacted the IRS and requested an expedited private letter ruling concerning the propriety of this withholding.[6] Comm.'s Stat. Undisp. Mat. Facts ¶ 24. The Comptroller wanted to know whether previously excepted employees of the Middlesex Sheriff's Department should continue to be excepted after their transfer to employment under the Commonwealth. *Id.* In the request letter, the Comptroller explained his conclusion that the exception no longer applied. *Id.* On June 29, 1998, the IRS ruled that the continuing-employment exception no longer applied to the previously excepted employees. *Id.;* I.R.S. P.L.R. 200247014, 2002 WL 31632950 (Aug. 12, 2002).

On January 28, 2002, the Commonwealth requested a reconsideration of the above-referenced private letter ruling. Comm.'s Stat. Undisp. Mat. Facts ¶ 24. Additionally, the Commonwealth requested a ruling that previously excepted employees of all the abolished counties continue to be excepted after the transfer date. Comm's Stat. Undisp. Mat. Facts ¶ 24. The IRS ruled that the continuing-employment exception no longer applied. *Id.;* I.R.S. P.L.R. 200247014 (Aug. 12, 2002).

---

**5.** The Act abolishing Franklin County reads substantially the same. *See* 1996 Mass. Legis. Serv. § 567(n).

**6.** A court may not cite or use a private letter ruling as precedent. *See* 26 U.S.C. § 6110(k)(3).

### 3. Refund requests

Plaintiff John Regan filed with the IRS for a refund of the Medicare taxes collected from him since 1997 on April 2, 2001. Regan's Summ. J. Mem. at 4. On May 11, 2001, the IRS denied this claim. *Id.* On June 11, 2001, Regan appealed, and more than six months have passed from the date of the appeal.[7]

On April 15, 2003, the Commonwealth filed for a refund of portions of Medicare taxes paid as employer from January 1, 1999 through December 31, 2002. Comm.'s Stat. Undisp. Mat. Facts. at ¶¶ 28, 29, 30. At this same time, the Commonwealth, on behalf of specific employees, filed for a refund of portions of Medicare taxes paid by those employees from January 1, 1999 through December 31, 2002. *Id.* On March 18, 2004, the IRS denied the refund requests for years 2000 through 2002. Comm.'s Stat. Undisp. Mat. Facts ¶ 30. The Commonwealth waived further administrative review for years 2000–2002 by accepting the disallowance and more than six months has passed since the requested refund for 1999. *Id.*

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Id.* at 248, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law."

*Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993) (internal quotation marks omitted) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

■ In making its determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Braga v. Genlyte Group, Inc.,* 420 F.3d 35, 38 (1st Cir.2005). The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings and[,] by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (citation and internal quotation marks omitted). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [courts] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d 103, 107 (1st Cir.2001).

### B. Continuing–Employment Exception To The Medicare Tax

The central issue in this case is whether the Commonwealth is a new employer and previously excepted employees are newly hired for the purposes of the continuing-employment exception. This case treads new legal ground. There are no control-

---

7. According to 26 U.S.C. § 6532(a)(1), "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty or other sum, shall begin before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time . . . ."

ling cases or cases in other jurisdictions directly on point.

If the Commonwealth is a new employer and the previously excepted employees are newly hired, the Plaintiffs will not qualify for the continuing-employment exception to the Medicare tax. If not, the Plaintiffs likely will qualify. The statute granting the continuing-employment exception is unclear on the issue facing this Court.

■■■ When interpreting a statute a court first looks to the statutory language to determine if it is plain and unambiguous. *United States v. Commonwealth Energy Sys.*, 235 F.3d 11, 15 (1st Cir.2000) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). If a statute is silent or ambiguous a court's first step is to "use traditional tools of statutory construction to determine congressional intent." *Harvey v. Veneman*, 396 F.3d 28, 33 (1st Cir. 2005) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694(1984)). A court should not defer to an agency interpretation when the legislative intent is clear. *Harvey*, 396 F.3d at 33–34. Thus, a court's analysis will end at this first step when the legislative intent is clear. If the legislative intent is not clear, a court will move to the second step and "accord deference to [an] agency 'as long as its interpretation is rational and consistent with the statute.'" *Id.* at 34 (citing *Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778).

In general, courts may face two different levels of deference owing to a particular administrative interpretation of a statute: 1) *Chevron* deference, or 2) *Skidmore* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

■■ *Chevron* deference binds courts to follow an administrative agency's interpretation unless it is arbitrary or capricious:

> When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," [*Chevron*, 467 U.S. at] 843–844, 104 S.Ct. 2778, and any ensuing regulation is binding in the courts unless *procedurally defective, arbitrary or capricious* in substance, or *manifestly contrary to the statute.*

*Mead*, 533 U.S. at 227, 121 S.Ct. 2164 (citing *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778) (emphasis added). The First Circuit recognizes *Mead* for the proposition that "'where statutory circumstances indicate no intent to delegate authority to make rules with force of law, or where such authority was not invoked,' a court must review agency interpretations under a less tolerant standard." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 98–99 (1st Cir.2001) (quoting *Mead*, 533 U.S. at 237–38, 121 S.Ct. 2164). The congressional intent to permit an agency to address an ambiguity in its controlling statute, or fill in the gaps of a statute need not be explicit. *Mead*, 533 U.S. at 229, 121 S.Ct. 2164. "[I]t can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result." *Id.* (quoting *Chevron*, 467 U.S. at 845, 104 S.Ct. 2778).

■ If an administrative interpretation does not qualify for *Chevron* deference, it receives *Skidmore* deference. *See Navarro*, 261 F.3d at 99. *Skidmore* deference means that a court will consider the ad-

ministrative interpretation in light of its persuasive power. *Id.* "Under [*Skidmore*, a court is] constrained to weigh the 'thoroughness evident in [the guidance's] consideration, the validity of its reasoning, its consistency with earlier and latter pronouncements, and all those factors which give it power to persuade, it lacking power to control.'" *Id.* (quoting *Skidmore v. Swift*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

### 1. The statutory language of the continuing-employment exception is unclear regarding the question at issue; legislative history supports the Plaintiffs' position

The statutory language governing the continuing-employment exception does not indicate how a court ought resolve the legal question at issue. Specifically, Title 26, Section 3121 of the U.S.Code does not provide a clear answer as to whether the Commonwealth is a new employer and the previously excepted employees are newly hired when a state abolishes a county and brings employment relationships under its control. Accordingly, this Court looks to the legislative history and other persuasive sources to shed light on the problem. The House Report states public policy concerns which support the Plaintiffs' position. Additionally, the House Report indicates that Congress intended that difficult cases ought be resolved by conducting an "independence analysis". The results of such an analysis also lend support to the Plaintiffs' position.

The Federal Insurance Contributions Act ("FICA") taxes employers and employees for the purpose of contributing to (a) an old-age, survivors, and disability insurance system ("OASDI") and (b) a hos-

pital insurance system (Medicare tax). 26 U.S.C. §§ 3101, 3111, 3121. The FICA tax is determined based on a percentage of the wages "paid by [the employer]," *id.* § 3111, and "received by [the employee] with respect to employment," *id.* § 3101; *see also id.* § 3121. Unless a remuneration is specifically excluded from falling within the term "wages", or a service is specifically excluded from falling within the term "employment", an employer's remuneration paid for employee's services will generally be subject to FICA tax. *Id.* §§ 3101, 3102, 3111, 3121.

If an employee of a state or political subdivision is a member of a retirement system of the same state or political subdivision and the employee is not covered by a "Section 218 agreement", the employee's services are not considered "employment" for the purpose of the OASDI portion of FICA tax. *Id.* §§ 3121(b)(7)(E), (F); *see also* 42 U.S.C. § 418 (codifying Section 218 of the Social Security Act). But if a state or political subdivision hired an employee after March 31, 1986 and the services the employee performs are not covered by a Section 218 agreement, then the employee's services constitute "employment" for the purpose of extending the Medicare portion of the FICA tax. *See* 26 U.S.C. § 3121(u)(2).

Section 3121(u)(2)(C) contains the continuing-employment exception to the Medicare portion of the FICA tax. This exception provides that certain state and local employment services will not be considered "employment" if:

> (i) such service would be excluded from the term "employment" for purposes of this chapter if subparagraph (A) did not apply; [8]

**8.** Section 3121(u)(2)(C)(i) requires that the employee seeking the continuing-employment exception be 1) a member of a retirement

system of such state or political subdivision and 2) is not a member of an agreement entered into pursuant to Section 218 of the

(ii) such service is performed by an individual—

(I) who was performing substantial and regular service for remuneration for that employer before April 1, 1986,

(II) who is a bona fide employee of that employer on March 31, 1986, and

(III) whose employment relationship with that employer was not entered into for purposes of meeting the requirements of this subparagraph; and

(iii) the employment relationship with that employer has not been terminated after March 31, 1986.

*Id.* § 3121(u)(2)(C).

### a. The language of Section 3121 does not clearly address the legal issue in question

The United States argues that the statutory language is clear and that the continuing-employment exception should not apply to the previously excepted employees. Cross–Mot. Summ. J. at 5. The United States frames the legal issue as whether the previously excepted employees have a continuing relationship with the same employer after the abolition of the counties. *See id.* at 5–6. It asserts that, based on the statutory language, a state employer is clearly a different employer than a county employer. *Id.* Therefore, the employees in question have not worked continuously for the same employer. *Id.*

In support of its argument, the United States points to a section of the statute which defines employers for the purpose of the exception:

(D) Treatment of agencies and instrumentalities.—

For purposes of subparagraph (C), under regulations—

(i) All agencies and instrumentalities of a State (as defined in section 218(b) of the Social Security Act) or of the District of Columbia shall be treated as a single employer.

(ii) All agencies and instrumentalities of a political subdivision of a State (as so defined) shall be treated as a

---

Social Security Act, as codified under Title 42, Section 418 of the U.S.Code. *See Id.* § 3121(u)(2)(C)(i) (cross-referencing Section 3121(u)(2)(A) (cross-referencing Section 3121(b)(7))).

The above-referenced requirements for the statutory cross-referencing runs as follows. An individual needs to satisfy clause (i) of Section 3121(u)(2)(C) to meet the continuing-employment exception. One satisfies clause (i) if the service she performs "would be excluded from term 'employment' ... if subparagraph (A) did not apply." *Id.* § 3121(u)(2)(C)(i). If subparagraph (A) did not apply, one would look to subsection (b), paragraph (7) in order to determine what services fall under the term "employment" when an individual provides services for a state or political subdivision. *See Id.* §§ 3121(u)(2)(A), 3121(b)(7). Subsection (b) provides that the term *employment shall not include:*

(7) *service[s] performed in the employ of a[s]tate, or any political subdivision ... [except:]*
(E) service included under an agreement entered into pursuant to *section 218* of the Social Security Act, or
(F) service in the employ of a[s]tate..., of any political subdivision... by an *individual who is not a member of a retirement system* of such [s]tate [or] political subdivision ....

*Id.* §§ 3121(b)(7)(E), (F) (emphases added). Accordingly, one's services under the employ of a state or political subdivision are not considered "employment" under (b)(7) if that person is not covered by a Section 218 agreement and is a member of a retirement system of such a locality. *Id.* As such services "would be excluded from term 'employment' ... if subparagraph (A) did not apply", then a person performing those services could satisfy clause (i). *See Id.* § 3121(u)(2)(C)(i).

single employer and shall not be treated as described in clause (i).[9] 26 U.S.C. § 3121(u)(2)(D)(i), (ii). As matter of law, the Commonwealth is a state, and the abolished counties were political subdivisions. *See id.* § 3121(u)(2)(D)(i), (ii); 42 U.S.C. § 418(b)(1), (2). The United States asserts that the plain language of the statute indicates that "lateral employment moves between State entities or between political subdivision[s] do not preclude application of the continuing employment exception." Cross–Mot. Summ. J. at 7. But "vertical moves between State entities and political subdivision[s] do preclude its application." *Id.*

Not surprisingly, the Plaintiffs frame the issue differently. The Plaintiffs argue that they satisfy all but one of the continuing-employment exception requirements found in clauses (ii) and (iii) of Section 3121(u)(2)(C). For the Plaintiffs, the legal issue is whether "the employment relationship with that employer has not been terminated after March 31, 1986." Comm.'s Summ. J. Mem. at 2; Regan's Summ. J. Mem. at 6. The Plaintiffs argue the answer to this question cannot be found in the language of the statute because the statute does not address what happens when employers consolidate. Comm.'s Summ. J. Mem. at 12; Regan's Summ. J. Mem. at 7. Moreover, the Plaintiffs argue that this Court must look both to the legislative history and the rationale of a Sixth Circuit case to determine the merits of the instant case.

Both the Commonwealth and Regan rely heavily on *Board of Educ. of Muhlenberg v. United States*, 920 F.2d 370 (6th Cir. 1990) to support their position that the statutory language is not clear. *See* Comm.'s Summ. J. Mem. at 9–18; Regan's Summ. J. Mem. at 7–9. In *Muhlenberg*, three school districts (Muhlenberg County, Central City Independent, and Greenville Independent) consolidated into one single school district (Muhlenberg County). *Id.* at 371. After the consolidation, the United States deemed the teachers of the Central City Independent and Greenville Independent School Districts newly hired employees of Muhlenberg County. *Id.* at 372. Presumably, none of the teachers were previously subject to the Medicare tax before the consolidation. *See id.* at 372–73. Subsequently, the IRS began collecting Medicare tax from the newly hired teachers and the school district, but considered that the teachers from the original Muhlenberg County School District still qualified for the continuing-employment exception to the Medicare tax. *Id.* at 372. The Sixth Circuit presented the issue in controversy as, "whether the plaintiff teachers were newly hired by a different employer after the consolidation ... or whether the teachers qualify for the continuing employment exception to the Medicare tax ...." *Id.* at 373. To determine if the teachers were newly hired, the court looked to the legislative history of the statute despite the language found in Section 3121(u)(2)(D):

9. Section 218(b) of the Social Security Act (42 U.S.C. § 418(b)(1), (2)) provides the following definitions: "(1) The term '[s]tate' does not include the District of Columbia, Guam, or American Samoa. (2) The term 'political subdivision' includes an instrumentality of (A) a State, (B) one or more political subdivisions of a State, or (C) a State and one or more of its political subdivisions."

The Commonwealth claims that the statement "all agencies ... of a political subdivision ... shall be treated as a single employer and shall not be treated as described in clause (i)" was written into the statute because the reference within Section 3121(u)(2)(D) to section 218 would otherwise make all political subdivisions state employers. *See* Comm.'s Reply Mem. at 3; *compare* 26 U.S.C. § 3121(u)(2)(D), *with* 42 U.S.C. § 418(b)(1), (2).

The language of the statute is unambiguous in the ordinary employment context involving an employee who quits or is terminated from one job and is hired for another. *It is clear, however, that the statute does not expressly address an event in which two or more employers consolidate . . . .* Therefore, we find it necessary to look to the legislative history, particularly to the policy behind the creation of the continuing employment exception.

*Muhlenberg,* 920 F.2d at 374 (emphasis added). The Sixth Circuit concluded that the statute did not clearly addresses a situation where employers consolidate. *Id.*

The United States argues that *Muhlenberg* is distinguishable from the instant case, as *Muhlenberg* involved the consolidation of local political entities. Def.'s Obj. Regan's Summ. J. Mem. at 5–6. "The Sixth Circuit did not address a case like this, and certainly did not read § 3121(u)(2)(D) out of the law . . . ." *Id.* at 6. "The Commonwealth ignores the difference between the lateral moves in *Muhlenberg* and the vertical moves [in the instant case which] go to the heart of the applicable statutes." Cross–Mot. Summ. J. at 8. Maintaining its position that there is no ambiguity in the statutory language, the United States asserts that under Section 3121(u)(2)(D) a state employer is a different employer than a political subdivision. Def.'s Obj. Regan's Summ. J. Mem. at 6. Accordingly, the United States argues that *Muhlenberg* is not on point. *See id.* at 5–6. Additionally, it claims the plain language of Section 3121(u)(2)(D) is consistent with the legislative history. *Id.* at 5–6.

Of course, *Muhlenberg* involved the consolidation of political subdivisions, while the instant case involves the consolidation of political subdivisions with state government. Yet such a difference does not invalidate the Sixth Circuit's trenchant observation that "[i]t is clear, however, that the statute does not expressly address an event in which two or more employers consolidate." *Muhlenberg,* 920 F.2d at 374. That court never stated that the lack of statutory clarity is limited to situations involving the consolidation of political subdivisions, even if the case dealt only with political subdivisions. As stated by the Sixth Circuit, the plain language of the statute is clear only to the extent that it addresses the situation where an employee "quits or is terminated from one job and is hired for another." *Muhlenberg,* 920 F.2d at 374.

Furthermore, the plain language of Section 3121(u)(2)(D) does not appear consistent with the United States's vertical and horizontal distinction. As the Commonwealth points out, clause (ii) of sub-paragraph (D) states that "[a]ll agencies and instrumentalities of *a political subdivision* of a State (as so defined) shall be treated as *a single employer.*" Comm.'s Reply Mem. at 4 (citing 26 U.S.C. § 3121(u)(2)(D)(ii) (emphases added)). Accordingly, it does not appear that from the literal meaning of clause (ii) "lateral employment moves . . . between political subdivision entities do not preclude application of the continuing employment exception." *Compare* Cross–Mot. Summ. J. at 7, *with* 26 U.S.C. § 3121(u)(2)(D)(ii).

Additionally, if the plain language of the statute is so clear, the House Report would not anticipate that the Secretary of the Treasury would issue regulations to help determine if an employee is newly hired. *See* House Report at 25. As the Commonwealth points out, the House Report "recognizes that defining entities as separate employers for purposes of determining whether an employee has been hired by a State or local entity after 1985, may pose complex issues for the Internal Revenue

Service." *Id.;* See Comm.'s Reply Mem. at 7.

The United States argues that *Muhlenberg* is distinguishable from the instant case because it only involved local political entities, Def.'s Obj. Regan's Summ. J. Mem. at 5–6, and argues that "[t]he legislative history is consistent with the plain language of § 3121(u)(2)(D)", as the House Report states "moves between state and local government would discontinue employment." *Id.* at 6. Perhaps for these reasons, the United States does not address the Sixth Circuit's discussion of the policy considerations in *Muhlenberg.*

Even so, this Court looks to the legislative history and other persuasive sources to reach its decision.

### b. Policy considerations undergirding the continuing-employment exception support the Plaintiffs' position

As observed by the Sixth Circuit in *Muhlenberg,* the policy considerations for the continuing-employment exception are based on preventing a financial burden on state and local governments while subjecting state and local employers to a mandatory Medicare tax.[10] These policy considerations support the Plaintiffs' position that the employees should not be deemed newly hired nor the Commonwealth a new employer for the purposes of the continuing-employment exception.

Prior to 1986, state and local employment was only covered by Social Security if the states entered into voluntary agreements. House Report at 25. In some instances, state and local employees who made no contributions to FICA taxes would still end up qualifying for benefits through a spouse or other employment. House Report at 25–26. This phenomenon created a financial problem, especially as it pertained to Medicare coverage. *Id.*

If an individual qualified for Medicare coverage, that individual was entitled to full coverage regardless of the level of contribution. *Id.* Thus, those state and local employees who qualified and utilized Medicare coverage while never making real contributions to the Medicare program would "drain" the system. *See id.* Accordingly, Congress extended Medicare coverage to newly hired state and local employees and subjected the employees and employers to the Medicare tax. *Id.* at 26–27; *see also* 26 U.S.C. §§ 3101(b), 3111(b).

The House was "aware of concerns among [s]tate and local governments about the financial burden that mandatory Medicare coverage for all of their employees might represent." House Report at 26, 1986 U.S.C.C.A.N. at p. 603. With such

---

**10.** Regan asserts that "[t]he *Muhlenberg* court appears to have used the successor liability method of analysis that has been applied in labor law." Regan's Summ. J. Mem. at 9. Regan asserts that, like the courts rationale in *Muhlenberg,* the doctrine of successor liability "protect[s] employees when the ownership of their employer suddenly changes." The United States's response appears only to suggest that "[w]hile such an exercise may be somewhat useful where a court is confronted with an ambiguous statute, it is of no use here." Def.'s Obj. Regan's Summ. J. Mem. at 9.

Regan misconstrues the Sixth Circuit's analysis of the policy behind the continuing-employment exception. In *Muhlenberg,* the Sixth Circuit observes that Congress was concerned with states facing the financial burden of the new mandatory Medicare tax, thus Congress intended that the tax apply only to newly hired employees. *See Muhlenberg,* 920 F.2d at 375. The policy behind the continuing-employment exception *seeks to protect* states from the financial burden of the mandatory Medicare tax. *See id.* The *Muhlenberg* opinion does not mention "the successor liability doctrine", and that doctrine is not applicable or analogous to the instant case.

concerns in mind, Congress provided for the continuing-employment exception so that the mandatory coverage would only apply to newly hired state and local employees. *See id.*

As mentioned previously, the case of *Muhlenberg* dealt with the issue of whether the consolidation of three local school districts into one larger local district created newly hired employees for the purposes of the continuing-employment exception. 920 F.2d at 373. The Sixth Circuit turned to the legislative history of the continuing-employment exception for guidance. *Id.* at 374. In examining the House Report, the Sixth Circuit observed that Congress created the continuing-employment exception to protect state and local governments from the financial burden that the mandatory Medicare tax would otherwise inflict. *Id.* at 375. Furthermore, the court concluded that allowing a consolidation of governmental entities to create a new employer frustrates the goals of the policy supporting the exception:

> The House Report's explanation for the continuing employment exception suggests that it was not the intent of Congress to treat a merger or consolidation as creating a new employer for the purposes of this statute because such a treatment would create the same sudden financial burden on state and local governments that the exception was drafted to mitigate. *Allowing a merger or consolidation to create a new employer for purposes of this statute would be inconsistent with the policy decision Congress made when it created the continuing employment exception.* Congress was not attempting to deter good faith consolidation of local government entities for the purposes of enhancing efficiency but rather to provide a gradual system of including employees in the Medicare system.

*Id.* at 375 (emphasis added). The Sixth Circuit relied in large part upon this policy argument in holding that the post-consolidation Muhlenberg County Board of Education "is the same employer as the former Central City, Greenville, and Muhlenberg County School Districts for purposes of interpreting 26 U.S.C. § 3121(u)(2)(C)." [11] *See id.* at 376.

---

11. In addition to the policy considerations found in the legislative history, "[t]he court in *Muhlenberg* found [an] analogy to the tax treatment under 26 U.S.C. § 402 of the lump sum retirement distribution received by an employee when two employers merge or consolidate persuasive." Regan's Summ. J. Mem. at 14. The Sixth Circuit agreed with the school district that "the [United States] is inconsistent in treating a consolidation as creating a new employer in this [Medicare] tax context but not in others." *Muhlenberg*, 920 F.2d at 375. The Sixth Circuit cites Revenue Ruling 79–336 for the proposition that "under § 402 employees are not considered separated from service if a liquidation, merger, or consolidation resulted in their working for a new employer." *Id.* (citing Rev. Rul. 79–336, 1979–2 C.B. 187, 1979 WL 51080.); *see also United States v. Haggart*, 410 F.2d 449, 452 (8th Cir.1969). Accordingly, the court concluded that such an analogy was persuasive in the context of Section 3121(u)(2)(C).

Regan asserts that the treatment of employer consolidations under Section 402 is applicable by analogy to the instant case under Section 3121. Regan's Summ. J. Mem. at 14–15. Subsequently, he alleges the analogy provides further persuasive force in the instant case that the employment was continuous despite a technical change in employers. *Id.* The argument seeks to extend the Sixth Circuit's rationale for the use of Section 402 to the instant case. *Id.* The United States responds that Section 3121 does not reference Section 402 and that the statute demands different treatment of state and local employers. Def.'s Obj. Regan's Summ. J. Mem. at 9.

If Section 402 is persuasive it is because it shows an inconsistency between the government's treatment of consolidated employers among various sections of the Code. *See Muhlenberg*, 920 F.2d at 375–6. There may, how-

The United States acknowledges that the continuing-employment exception was introduced to protect the states and local governments from the sudden burden of mandatory Medicare taxes. Cross–Mot. Summ. J. at 10–11. But it stresses that such an exception merely provided for the state and local government's gradual transition into the mandatory Medicare tax. *Id.* at 11. The United States points out that the Commonwealth did escape the sudden inclusion of all its employees. *Id.* The Commonwealth did have notice regarding the Medicare tax and yet it voluntarily abolished the counties. *Id.* at 11–12. Furthermore, the case only involves a relatively small number of employees who were subjected to the Medicare tax ten years after Congress mandated that the Medicare tax applied to all newly hired state and local government employees. *Id.* The policy supports the gradual transition of government employees into the Medicare system, and subjecting the Plaintiffs to the Medicare tax is allegedly consistent with these policy considerations.

If Congress had intended for the continuing-employment exception to remain in force for ten years or less, it could have written that into the statute. The continuing-employment exception was intended to transition state and local governments into the mandatory Medicare tax system regardless of the amount of time it took. *Id.* at 10–11. A court would inappropriately inflict the financial burden of mandatory Medicare taxation on the Commonwealth when individuals whom Congress intended to qualify for an exception are prevented from qualifying. It is true that the total amount the Commonwealth owes would be less if the taxation clock starts ticking for

these employees after ten years as opposed to when the mandatory Medicare tax went into effect. Regardless, just because the burden is less, it is still against the policy considerations to make individuals Congress intended to except from the tax instead subject to the tax because an arbitrary number of years have passed.

The Sixth Circuit stated that if a consolidation creates a new employer under the continuing-employment exception, such a result would be against the policy supporting the Medicare tax exception. *Muhlenberg,* 920 F.2d. at 375. Even if this Court accepts that the Sixth Circuit in *Muhlenberg* refers on this point only to a consolidation of local employers, the rationale still can and does apply to a consolidation of local employers into state employment. In *Muhlenberg,* the court stated that "Congress was not attempting to deter good-faith consolidation of local government entities for the purposes of enhancing efficiency but rather to provide a gradual system of including employees in the Medicare system." *Id.* Congress would not treat a consolidation of local entities as forming a new employer and employees because "such a treatment would create the same sudden financial burden on state and local governments that the exception was drafted to mitigate." *Id.*

The same rationale applies to the abolition of counties and the transfer of their employees to state employment for the purposes of enhancing state efficiency. The gravamen of the United States's argument is that the language of Section 3121(u)(2)(D) is clear. Cross–Mot. Summ. J. at 5–6. According to it, a court should always treat state employers differently from county employers. *See id.* at

ever, be various rational policy reasons for the different treatment of consolidated employers within different sections of the Code. Additionally, it is not clear from Regan's assertions or *Muhlenberg* if Section 402 is the

general way the tax code treats consolidated employers in analogous situations. The best way to resolve the issue before this Court is to turn to the legislative history because it provides surer footing on slippery ground.

7–8. Even if a court looks to the legislative history, it allegedly shows that Congress intended vertical moves in employment should be treated differently than horizontal moves. *See id.* at 9–10.

Yet when this Court looks at the statutory language and the legislative history and concludes that the United States's interpretation is unsupported, there is little left to justify the result which it requests. The result of holding that the Commonwealth is a new employer and the formerly excepted county employees are newly hired would cause the Commonwealth a financial burden. This financial burden would be equally as "inconsistent with the policy decision Congress made when it created the continuing employment exception" as it would in the context of the consolidation of political subdivisions. *See Muhlenberg,* 920 F.2d at 375. It appears just as likely that Congress would have intended to protect states from the kind of financial burden which would be inflicted upon them if this Court deemed the Commonwealth a new employer, as Congress would in the context of political subdivision consolidations. *See id.*

For the above-mentioned reasons, the Court holds that the policy considerations of the continuing-employment exception support that the Commonwealth is not a new employer, and the previously excepted employees are not newly hired.

**c. Alternatively, the House Report provides for an "independence analysis" to determine if an entity is a new employer, and such analysis also supports that the Commonwealth is not a new employer**

The House anticipated that the Secretary of the Treasury would create regulations to aid in the determination of "whether an individual employee is newly hired and thus covered, or has in fact not been separate from his previous excluded employment ...." [12] *Id.* The House Report provided guidance in making such a determination:

> It should be generally true that employees who move between different jobs in different integral units of a State government, such as different departments within the State government, would be considered continuously employed by the State, while employees who move from State government employment to a job with a local township, count or municipality, or vice versa, would be considered to be newly hired. *The Committee expects that cases in which the distinctions are more difficult to make will be judged according to the independence of the second employing unit from the first, as an employer.*

*Id.* at 26–27, U.S.C.C.A.N. at pp. 604–05 (emphasis added).

The Commonwealth asserts that it "has no real independence from the abolished counties [as an employer], and thus the continuing employment exception applies." Comm.'s Summ. J. Mem. at 18. In support of its position, the Commonwealth points out that it transferred the employees with the same rights, seniority, compensation, union representation, and collective bargaining agreements. *Id.* at 18–19 (citing Mass. Gen. Laws ch. 34B, § 14(a)). As recognized even by the United States, "[a]fter abolishment, the [e]mployees, under the aegis of the Commonwealth rather than the counties, performed

---

**12.** The Sixth Circuit noted in *Muhlenberg* that "[t]he House Report recognized the difficulty of deciding who is 'newly hired' and invited the Treasury to write regulations[, but] [t]he treasury has not done so." 920 F.2d at 374 n. 4. Fifteen years after *Muhlenberg,* the IRS has still not provided such regulations. Comm.'s Summ. J. Mem. at 13.

the same or similar functions." Cross–Mot. Summ. J. at 2. Furthermore, the Commonwealth paid all outstanding liabilities and assumed all of the contracts of the abolished counties. Comm.'s Summ. J. Mem. at 19. In addition, the Commonwealth asserts that as it had been paying a large portion of the financial costs for operating the sheriffs' departments, the abolition embraced the reality that the counties were dependent on state funding. *See id.* at 19–20; Comm.'s Stat. Undisp. Mat. Facts ¶¶ 7–9, 14. The Commonwealth contends it made "no 'clean break' with [county employees] or employment obligations." Comm.'s Summ. J. Mem. at 19. "Rather, [the Commonwealth] stepped directly into [the abolished counties'] shoes." *Id.*

In response, the United States first argues that the Commonwealth failed to show why the instant case is sufficiently difficult to warrant the independence analysis found in the House Report. Cross–Mot. Summ. J. at 12. Second, the United States asserts that "[t]o the extent that the Commonwealth insists that this is a 'more difficult' case requiring additional guidance, that guidance is available in the form of a revenue ruling." *Id.* at 13. Third, the United States claims that the revenue ruling to which it refers is entitled to *Chevron* deference. *Id.* Fourth, the United States asserts that even under the independence analysis, the Commonwealth is not sufficiently dependent on the abolished counties to prevent it from counting as a new employer. *Id.* at 15.

First, this is a difficult case where the law is not clear. It is of little importance that the Commonwealth did not expressly make such an assertion. The Commonwealth has demonstrated that, after the abolition date, the substantive nature of the employment relationship stayed substantially the same. Comm.'s Summ. J. Mem. at 18–19. Additionally, the Com-

monwealth clearly asserts that the similarities and the lack of independence between the employing entities supports a ruling that the employment is continuous. *See* Comm.'s Summ. J. Mem. at 18–20. Such a ruling is appropriate despite the fact that, as matter of law, the Commonwealth is the current employer. *See id.* The present scenario is sufficient for this Court to rule that the case is difficult enough to warrant the independence analysis.

■ Second, the United States is incorrect in asserting that an administrative revenue ruling should guide the analysis. *See* Cross–Mot. Summ. J. at 13. A court ought first look to the legislative history before considering "agency interpretations or other devices of construction." *Tupper v. United States,* 134 F.3d 444, 446 (1st Cir.1998). Courts and agencies must follow the expressed intent of Congress. Thus, if such intent is found in the legislative history the analysis ends. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778. The House Report states "[t]he Committee expects that cases in which the distinctions are more difficult to make will be judged according to the independence of the second employing unit from the first." House Report at 26–27, U.S.C.C.A.N. at pp. 604–05. Here the House Report calls for an analysis of the independence of the employing units in situations where it is difficult to determine whether an employee has been continuously employed. Revenue rulings are not mentioned in the House Report for this purpose at all. Thus, a court should not jump first to the revenue ruling without exhausting the legislative history. Within the legislative history, Congress intends that difficult cases will be judged under an "independence analysis".

Third, the United States is not correct that Revenue Ruling 86–88 ("the revenue

ruling") is entitled to *Chevron* deference. The revenue ruling reads:

> Q7. An employee who was hired before April 1, 1986, by a state employer transferred after March 31, 1986, to another state employer of that state. The transfer was made without a termination of the employee's overall employment relationship with that state. Does the employee qualify for the continuing employment exception?
>
> A7. Yes. An employee hired before April 1, 1986, by a state employer who transfers after March 31, 1986 ... may qualify ..., provided the transfer was made without a termination of the employee's overall employment relationship with that state. The same rule applies to an employee hired ... by a political subdivision employer, who transfers ... to another political subdivision employer of that political subdivision.
>
> On the other hand, an employee hired before April 1, 1986, does not qualify for the continuing employment exception if after March 31, 1986, the employee transfers from a state employer to a political subdivision employer or from a political subdivision employer to a state employer. Likewise, an employee does not qualify for the exception if the employee transfers from a political subdivision employer in one political subdivision to a political subdivision employer in a different political subdivision, or from a state employer in one state to a state employer is a different state. Section 3121(u)(2)(D).

Rev. Rul. 86–88, 1986–2 C.B. 172, 1986 WL 328030.

The United States does not provide any reason why the revenue ruling is entitled to such strong deference other than it is long-standing. *See* Cross–Mot. Summ. J. at 13. In examining the pertinent statutory provisions and legislative history, it is not clear what could support a claim that the revenue ruling is entitled to *Chevron* deference. The House Report does "*anticipat[e] that the Secretary of the Treasury* will issue *regulations* relating ... to the technical rules under which it will be determined whether an individual employee is newly hired and thus covered ....*" House Report at 26 (emphasis added). This statement, however, does not entitle an IRS revenue ruling to such strong deference. The House Report does not evidence that Congress intended the IRS to make revenue rulings with the force of law. *See Navarro*, 261 F.3d at 98–99. One might be able to argue that Congress intended that the Secretary of the Treasury promulgate regulations with the force of law, but the instant case obviously does not involve regulations.

The United States has not provided any specific case law which supports the conclusion that revenue rulings are entitled to *Chevron* deference or that other statutory circumstances show that Congress would expect that revenue rulings have the force of law.[13] Judge Saylor recently stated that a revenue ruling was "entitled to substantial deference", *Wheeler v. United States*, No. 03–40128, 2005 WL 3277952, at *4 (D.Mass. Aug.24, 2005) (Saylor, J.), yet his analysis does not extend to, or even mention *Chevron* deference. *Id.* Moreover, the Sixth Circuit does not grant revenue rulings *Chevron* deference because, when the IRS issues revenue rulings, it does not invoke the authority to make the rulings with the force of law. *Aeroquip–Vickers, Inc. v. Comm'r of Internal Revenue*, 347

---

**13.** The United Stated does claim that the revenue ruling "has the same legal effect as a regulation." Cross–Mot. Summ. J. at 14.

F.3d 173, 181 (6th Cir.2003). Revenue Procedure 89–14 states that "[r]evenue rulings published in the Bulletin *do not have the force and effect of Treasury Department regulations* (including Treasury Decisions), but are published as precedents to be used in the disposition of other cases, and may be cited for that purpose." Rev. Proc. 89–14, 1989–8 I.R.B. 20, 1989 WL 519042 (emphasis added).

■■■■ This Court rules that Congress did not intend for the revenue ruling at issue here to have the force of law and, as the IRS does not claim such force when making such rulings, this one does not qualify for *Chevron* deference. *See Navarro*, 261 F.3d at 98–99.

Assuming arguendo that the revenue ruling was entitled to *Chevron* deference (or *Skidmore* deference for that matter), the revenue ruling does not address the issue of consolidation. Thus, it cannot bind or persuasively inform the Court's analysis of the instant case.

Revenue Ruling 86–88 deals with the "transfer" of employment in a traditional sense, not in the more difficult situation where employers consolidate. Similar language can be found in the House Report, with one difference. *See* House Report at 26–27. In the House Report, after noting that it will generally be true that "employees who move from State government employment to a job with a ... county ..., or vice versa, would be considered to be newly hired," the report states that the committee expects more difficult cases to "be judged according to the independence of the second employing unit from the first, as an employer." *Id.* Even if this revenue ruling was entitled to *Chevron* deference, it would not be relevant to the analysis because it does not address the legal question at issue in the instant case.

Additionally, a strict reading of this revenue ruling's interpretation of Section 3121(u)(2)(D) would conflict directly with the holding of *Muhlenberg,* as the revenue ruling states: "an employee does not qualify for the exception if the employee transfers from a political subdivision employer in one political subdivision to a political subdivision employer in a different political subdivision." Rev. Rul. 86–88, 1986–2 C.B. 172, 1986 WL 328030. Accordingly, any transfers between political subdivisions would break the continuity of employment under such a narrow interpretation. Moreover, this revenue ruling's narrow interpretation would conflict with the United States's position that "lateral employment moves between ... political subdivisions ... do not preclude application of the continuing employment exception." *Compare id., with* Cross–Mot. Summ. J. at 7. This revenue ruling does not address situations where employers consolidate.

Fourth, the United States argues that "the allegation that the Commonwealth has no independence from the county governments it abolished is both unsupported and unsupportable." *Id.* at 15. The United States contends that the Commonwealth never provided criteria to determine independence for the purpose of the analysis. *Id.* Additionally, the United States asserts that the Commonwealth provided insufficient contractual and financial factors to find the lack of independence between employers that warrants extending the continuing-employment exception. *Id.*

True, the Commonwealth did not provide any criteria to determine "independence" for the purpose of the analysis and the parties have neither suggested, nor briefed an analysis of the instant case based on any specifically stated definition of "independence" or "independent". The legislative history is also noticeably silent on this point. The House Report only

states, "cases in which the distinctions are more difficult to make will be judged ac-. cording to the independence of the second employing unit from the first, as an employer." House Report at 26–27. Such a broad form of comparative analysis may lend itself most readily to a totality of the circumstances approach. In searching for criteria to define independence, this Court considers it useful to examine traditional methods of definition such as Black's Law Dictionary:

> **independence,** n. The state or quality of being independent . . . .
>
> **independent,** adj. 1. Not subject to the control or influence of another <independent investigation>. 2. Not associated with another (often larger) entity <an independent subsidiary>. 3. Not dependent or contingent on something else <an independent person>.

*Black's Law Dictionary* 785 (8th ed.2004)(emphases in original).

A narrow reading of the word "independent" supports the United States's position that the Commonwealth is fully independent. The Commonwealth may be an independent employer because it abolished the counties, thus they no longer exist. Accordingly, the Commonwealth, as second employing unit, is not dependent or its powers contingent in any way on the abolished counties. *See* Cross–Mot. Summ. J. at 15–16. Also, the Commonwealth is not subject to the control of the abolished counties. In fact, the Commonwealth abolished the counties through its own legislative process.

More broadly read, though, the Commonwealth is not independent from the counties as an employer. The Commonwealth "stepped into the shoes" of the counties as an employer. *See* Comm.'s Summ. J. Mem. at 19. The Commonwealth is more than just "associated" with the counties as an employer, it abolished and took over the position of employer. *See* Mass. Gen. Laws ch. 34B, §§ 12–14. The Commonwealth, as employer, did not change the substantive nature of the employment relationship. *See* Cross–Mot. Summ. J. at 2. The Commonwealth might not currently be subject to the control or influence of the abolished counties; yet, the Commonwealth did subject itself to many of the counties' earlier decisions and obligations. The Commonwealth assumed all the counties outstanding financial liabilities and contractual obligations. *See* Comm.'s Summ. J. Mem. at 19; Mass. Gen. Laws ch. 34B, §§ 5,7.

On balance, the Commonwealth is not sufficiently independent as an employer to warrant deeming the transferred employees as newly hired or the Commonwealth as a new employer for the purpose of the continuing-employment exception.

### III. CONCLUSION

Section 3121 does not clearly or unambiguously address the issue facing this Court. The legislative history provides policy considerations and a method of analysis which support the Plaintiffs' position. For these reasons, the Court GRANTED Plaintiff's Motions for Partial Summary Judgment [Doc. Nos. 32, 44] on January 31, 2006. *See* Order of 01/31/06 [Doc. No. 62].